MBS-Certified Public Accountants, LLC
and Thomas H. Schmitt, CPA,
d/b/a Metropolitan Business Services,
Plaintiffs-Appellants-Cross
Respondents-Petitioners,

v.

Wisconsin Bell Inc., d/b/a AT & T Wisconsin,
Defendant-Respondent,

ILD Telecommunications, Inc., d/b/a ILD
Teleservices, Local Biz USA, Inc. and
Americatel Corporation,
Defendants-Respondents-Cross-Appellants,

US Connect, LLC,
Defendant.

Supreme Court

No. 2008AP1830. *Oral argument September 16, 2011.*
*—Decided February 24, 2012.*

2012 WI 15

(Also reported in 809 N.W.2d 857.)

649

For the plaintiffs-appellants-cross-respondents-petitioners, there briefs filed by *Douglas P. Dehler* and *O'Neil Cannon, Hollman, DeJong & Laing, S.C.,* Milwaukee, *James E. Miller,* pro hac vice, *James C. Shah,* pro hac vice, and *Shepherd, Finkelman, Miller & Shah, LLC,* Media, PA, and oral argument by *Douglas P. Dehler.*

For the defendant-respondent there were briefs filed by *Paul F. Linn, Ted A. Wisnefski,* and *Michael, Best & Friedrich, LLP,* Milwaukee, and oral argument by *Paul F. Linn.*

For the defendant-respondent-cross-appellant there were briefs filed by *Robert H. Friebert, Christopher M. Meuler* and *Friebert, Finerty & St. John, S.C.* of Milwaukee, and *Gregory F. Harley,* pro hac vice, and *Burr & Forman, LLP,* and oral argument by *Gregory F. Harley.*

An amicus curiae brief was filed by *John S. Greene, assistant attorney general,* with whom on the brief was *J. B. Van Hollen, attorney general,* on behalf of the State of Wisconsin.

¶ 1. ANN WALSH BRADLEY, J. The petitioners, Thomas H. Schmitt and MBS-Certified Public Accountants, LLC (collectively, MBS), seek review of an unpublished decision of the court of appeals affirming a circuit court order dismissing their claims for monetary relief.[1] The circuit court determined that the common law voluntary payment doctrine barred MBS's claims against Wisconsin Bell, Inc. and ILD Telecommunications, Inc. for damages under Wis. Stat. § 100.207 and other statutes.[2]

¶ 2. The defendant telecommunications companies assert that *Putnam v. Time Warner Cable of Southeastern Wisconsin,* 2002 WI 108, 255 Wis. 2d 447, 649 N.W.2d 626, is squarely on point and forecloses the argument advanced by MBS. Additionally, they contend that under the rule of *Fuchsgruber v. Custom Accessories, Inc.,* 2001 WI 81, 244 Wis. 2d 758, 628 N.W.2d 833, the legislature was required to make explicit reference to the voluntary payment doctrine in the text of Wis. Stat. § 100.207 if it intended the doctrine to be inapplicable to claims under that statute.

¶ 3. We conclude that no Wisconsin court has addressed whether the legislature intended the voluntary payment doctrine to be a viable defense against

---

[1] *See MBS-Certified Public Accountants, LLC & Schmitt v. Wisconsin Bell,* No. 2008AP1830, unpublished slip. op. (Wis. Ct. App. Aug. 10, 2010), affirming orders of the circuit court for Milwaukee County, Richard J. Sankovitz, Judge, presiding.

[2] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

any cause of action created by a statute. In *Putnam,* the question of whether the voluntary payment doctrine was a viable defense to a claim under Wis. Stat. § 100.18(1) may have lurked in the record, but it was neither brought to the attention of the court nor was it specifically addressed. Accordingly, it was not decided by this court.

¶ 4. We further determine that the defendants misinterpret *Fuchsgruber.* Application of the common law voluntary payment doctrine would undermine the manifest purposes of Wis. Stat. § 100.207. Under these circumstances, the conflict between the statute's manifest purpose and the common law defense leaves no doubt that the legislature intended that the common law defense should not be applied to bar claims under the statute.

¶ 5. Accordingly, we reverse and remand to the court of appeals to address ILD's cross-appeal and, if appropriate, any previously unresolved appellate issues regarding Wis. Stat. § 100.18(1) and the Wisconsin Organized Crime Control Act.

I

¶ 6. The allegations at issue in this case relate to an illegal telecommunications practice called "cramming." According to MBS, cramming is a deceptive billing scheme in which telecommunications companies insert relatively small, unauthorized charges into customers' telephone bills with the expectation that the customers will unwittingly pay the unauthorized charges.

¶ 7. The facts set forth below are taken primarily from MBS's complaint. Because we are reviewing the circuit court's grant of a motion to dismiss for failure to state a claim, we must assume that these facts are true.

¶ 8. Thomas Schmitt is an accountant who owns and operates MBS-Certified Public Accountants, LLC (MBS). Wisconsin Bell is the local exchange carrier that provides MBS's telephone service.[3] At some point, Schmitt discovered that Wisconsin Bell's telephone bills contained unauthorized charges. Schmitt and MBS filed suit.[4]

¶ 9. According to the allegations in the complaint, the unauthorized charges, which ranged from $2 to $40 per month, were generated by three service providers, Local Biz USA, U.S. Connect, and AmericaTel. These service providers are in the business of providing internet and web hosting services, directory assistance services, and international calling plans, respectively. MBS asserted: "Because consumers would be more likely to question unauthorized charges if they were contained in bills sent to them directly by the Service Provider Defendants . . . , those Service Provider Defendants enlist the aid of third-party billing companies, . . . which agree to take part in the deceptive business practices in exchange for a fee."

¶ 10. According to MBS, the unauthorized charges were forwarded to ILD Communications (ILD), a billing clearinghouse. ILD aggregated the unauthorized charges and then forwarded them on to Wisconsin

---

[3] Although MBS's complaint named AT&T, Inc., the parties agree that Wisconsin Bell d/b/a AT&T Wisconsin is the correct name of the intended defendant. The parties stipulated to the dismissal of AT&T and the substitution of Wisconsin Bell.

[4] Schmitt and MBS filed suit "on behalf of themselves and all others similarly situated." The complaint was dismissed before the circuit court had the occasion to determine whether it was appropriate to certify the lawsuit as a class action. Accordingly, at this point the only plaintiffs in this lawsuit are Schmitt and MBS.

Bell, where they were incorporated into MBS's telephone bills under the heading "Miscellaneous Charges and Credits." The complaint alleges that Schmitt did not notice the unauthorized charges and unwittingly paid them.

¶ 11. The defendants named in MBS's complaint fall into three categories: service providers (Local Biz USA, U.S. Connect, and AmericaTel); billing clearinghouses (ILD); and local exchange carriers (Wisconsin Bell). At this point, however, only two defendants, ILD and Wisconsin Bell, remain as parties to this appeal.[5]

¶ 12. In relevant part, the complaint alleged violations of Wis. Stat. § 100.207(2) and (3)(a), violations of Wis. Stat. § 100.18(1), and violations of the Wisconsin Organized Crime Control Act, Wis. Stat. § 946.80, et seq. (hereinafter, the Crime Control Act).[6] The telecommunications company defendants filed motions to dismiss, alleging various defenses including the voluntary payment doctrine. Under that doctrine, a party cannot bring an action "to recover payments that [were] paid voluntarily, with full knowledge of the material facts, and absent fraud or wrongful conduct inducing payment." *Putnam,* 255 Wis. 2d 447, ¶ 13.

¶ 13. At a hearing on the defendants' motions, the circuit court dismissed all claims for monetary relief

---

[5] U.S. Connect never appeared in the action before the circuit court and was defaulted. Further, while this case was pending at the court of appeals, AmericaTel was dismissed to accommodate a settlement agreement, and Local Biz filed for bankruptcy and was later dismissed under Wis. Stat. § (Rule) 809.18.

[6] Additionally, the complaint alleged violations of Wis. Stat. § 100.20(5) and unjust enrichment. MBS did not appeal the circuit court's dismissal of either of these claims. Therefore, they are not before this court.

against ILD and Wisconsin Bell with one exception.[7] The circuit court's analysis focused primarily on the language of 100.207(2) and (3)(a). It determined that although the complaint properly alleged violations of Wis. Stat. § 100.207, the voluntary payment doctrine would bar any entitlement to monetary relief.

¶ 14. Taking the allegations in the complaint as true, the court concluded that each of the defendants made false statements with regard to the provision of telecommunications service in violation of § 100.207(2).[8] It explained: "Stating on a phone bill that a customer owes money for services the customer did not authorize is false. . . . And that seems to be the only element that must be shown to demonstrate a violation of Wis. Stat. § 100.207(2)."

¶ 15. The court also concluded that all of the defendants except ILD violated § 100.207(3)(a).[9] The

---

[7] The circuit court refrained from dismissing claims for money damages arising out of one charge generated by U.S. Connect. *See infra,* ¶ 19 n.10. Additionally, the court's order left intact MBS's claims for injunctive relief. Ultimately, the parties stipulated to dismiss the claims for injunctive relief with prejudice.

[8] Wisconsin Stat. § 100.207(2) provides:

A person may not make in any manner any statement or representation with regard to the provision of telecommunications services, including the rates, terms or conditions for telecommunications service, which is false, misleading or deceptive, or which omits to state material information with respect to the provision of telecommunications service that is necessary to make the statements not false, misleading or deceptive.

[9] Wisconsin Stat. § 100.207(3)(a) provides:

A person may not engage in negative option billing or negative enrollment of telecommunications services, including unbundled telecommunications services. A person may not bill a customer for any telecommunications service that the customer did not affir-

court excepted ILD because it was "satisfied that ILD did not bill the plaintiffs. ILD collected, packaged, and communicated billing information to Wisconsin Bell, but that conduct cannot fairly be described as 'billing'[.]"

¶ 16. Nevertheless, the court went on to conclude that "the complaint also establishes a possible defense to the damage claim." Relying on MBS's allegation that Schmitt "did not notice the charges and unwittingly paid them," it asserted: "[T]he complaint implies that the plaintiffs voluntarily paid the unlawful charges."

¶ 17. The court concluded that the voluntary payment doctrine was a viable defense to MBS's claims for damages under Wis. Stat. § 100.207 because the legislature did not insert any language in the statute that expressly abrogated the common law doctrine:

> I reach this juncture in my reasoning by following the maxim that a court cannot read a statute to override the common law unless the legislative purpose to do so is clearly expressed in the language of the statute.
>
> A good example of this principle at work is *Fuchsgruber v. Custom Accessories, Inc.,* [244 Wis. 2d 758] . . . .
>
> Likewise, in the case before me, I find a lack of any explicit reference to voluntary payment in section 100.207, and that lack of any explicit reference to the possibility of voluntary payment leads me to conclude that the Legislature did not intend for this statute to override this common law doctrine.

matively order unless that service is required to be provided by law, the federal communications commission or the public service commission. A customer's failure to refuse a person's proposal to provide a telecommunications service is not an affirmative request for that telecommunications service.

> I simply do not find any words suggesting that you can claim damages under the statute even if you voluntarily paid.

The court asserted that it was required to "presume the Legislature knew about the doctrine and knew this would be raised as a defense, [and] if they didn't want it raised as a defense, they would have said so."

¶ 18. Additionally, the circuit court found support in *Putnam:* "I'm also influenced by the fact that the *Putnam* court upheld the application of the common law voluntary payment doctrine against not only common law damage claims, but also a statutory claim."

¶ 19. Wisconsin case law recognizes three exceptions to the voluntary payment doctrine: fraud, duress, and mistake of fact. *See Putnam,* 255 Wis. 2d 447, ¶ 13. Turning to those exceptions, the circuit court determined that MBS had alleged fraud but had failed to "satisfy the court" that the charges were sufficiently deceptive to fulfill the elements of common law fraud: "[T]he charges were stated with sufficient particularity that a reasonable customer would be startled to find such a charge on the bill."[10]

¶ 20. As explained above, the circuit court's analysis was focused on the language of Wis. Stat. § 100.207. It did not specifically examine Wis. Stat. § 100.18(1) or the Crime Control Act to determine whether the voluntary payment doctrine was applicable to claims under those statutes. Nevertheless, by dismissing all of MBS's

---

[10] The court made one exception for the charge for "MONTHLY SVCS" generated by U.S. Connect. It explained: "[t]he words, 'monthly service fee' are generic and ambiguous enough that even a dedicated bean counter might look at that and say, okay I can see why I have to pay a monthly fee, and would be easily hoodwinked."

claims for monetary relief, it appears that the court implicitly concluded that the doctrine was a viable defense to claims under Wis. Stat. § 100.18(1) and the Crime Control Act as well.

¶ 21. Additionally, the court provided an alternative rationale for dismissing the claims under Wis. Stat. § 100.18(1). It concluded that that statute applied to representations that are made in advertisements and sales promotions, and that the telephone bills did not constitute advertisements or sales promotions.[11] At a hearing on MBS's motion for reconsideration, the court stood by its previous decision to dismiss the claims.[12]

---

[11] Wisconsin Stat. § 100.18(1) provides:

No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

[12] The court further elucidated upon its alternative rationale for dismissing the Wis. Stat. § 100.18(1) claim. It explained

¶ 22. MBS appealed the dismissal of its claims for relief under Wis. Stat. § 100.207, Wis. Stat. § 100.18(1), and the Crime Control Act. The primary focus of its brief to the court of appeals was the applicability of the voluntary payment doctrine. In addition, MBS appealed the circuit court's alternative rationale for dismissing the § 100.18(1) claims and the court's determination that MBS failed to state a § 100.207(3)(a) claim against ILD because ILD did not "bill" MBS.

¶ 23. ILD cross-appealed. It argued that in addition to the voluntary payment doctrine, the dismissal of the Wis. Stat. § 100.207 claims against it should be affirmed on other grounds.[13]

¶ 24. Relying primarily on *Fuchsgruber* and *Putnam,* the court of appeals concluded that the voluntary payment doctrine applied to bar MBS's claims for monetary relief. *MBS-Certified Public Accountants, LLC & Schmitt v. Wisconsin Bell,* No. 2008AP1830, unpublished slip. op. (Wis. Ct. App. Aug. 10, 2010). Because of this determination, the court of appeals declined to address the additional arguments presented by MBS and declined to address ILD's cross-appeal. *Id.,* ¶ 1.

that the representations in the telephone bills did not constitute advertisements or sales promotions because they were not made to the public for the purpose of inducing a future sale.

[13] In its cross-appeal, ILD argued that the Wis. Stat. § 100.207(2) claim against it was unavailing because (1) the statute prohibits false, misleading, or deceptive statements and representations, and ILD did not make any statement or representation to MBS; (2) the statute applies to statements made in the context of advertising or sales promotions, and the bills were not advertising or sales promotions; and (3) MBS lacks standing to file suit under Wis. Stat. § 100.207 because MBS is not a "consumer" as that term has been defined by the Department of Agriculture, Trade and Consumer Protection.

¶ 25. Upon review, we must determine whether the circuit court properly granted the defendants' motions to dismiss. We review a grant or denial of a motion to dismiss independently of the determinations rendered by the circuit court and the court of appeals. *Pool v. City of Sheboygan,* 2007 WI 38, ¶ 9, 300 Wis. 2d 74, 729 N.W.2d 415. Like the circuit court and the court of appeals, we must assume that the allegations in the complaint are true. *Putnam,* 255 Wis. 2d 447, ¶ 11.

¶ 26. This case presents the issue of whether the voluntary payment doctrine is a viable defense to claims under several statutes. Ultimately, this is a matter of statutory interpretation. It must be decided whether the legislature intended the common law defense to be applied to bar monetary relief under these statutes. Statutory interpretation is a question of law, which we also review independently of the determinations rendered by the circuit court and the court of appeals. *Pool,* 300 Wis. 2d 74, ¶ 9.

¶ 27. We begin by addressing the defendants' contention that the issue in this case was already decided in *Putnam,* 255 Wis. 2d 447, a recent decision of this court. Then, we turn to interpreting the statute and addressing the defendants' argument that *Fuchsgruber,* 244 Wis. 2d 758, resolves the matter of statutory interpretation that is presented by this case.

III

¶ 28. MBS asserts that the voluntary payment doctrine is not a viable defense to its statutory claims for damages because the doctrine conflicts with the

purposes of the statutes. The defendant telecommunications companies counter that we need look no further than a recent decision of this court to resolve the issue. They contend that *Putnam* demonstrates that the voluntary payment doctrine is a viable defense to all statutory claims. Therefore, they argue that *Putnam* forecloses the argument advanced by MBS.

¶ 29. In *Putnam,* the dispute revolved around the enforceability of a clause in Time Warner's standard cable contract. The clause imposed a late-payment fee on customers who failed to timely pay their bills. 255 Wis. 2d 447, ¶ 4. A class of customers who paid the fees subsequently filed suit to recover their payments, alleging that the fees were not reasonably related to Time Warner's actual costs. *Id.* The customers averred that the fees constituted unlawful liquidated damages. *Id.,* ¶ 10.

¶ 30. The complaint set forth eight separate causes of action for monetary damages, including a claim for damages under "Wisconsin's Trade Practices Act."[14] *Id.,* ¶ 4 n.2. We explained in a footnote that each of these claims for damages was "premised on a theory of liability that Time Warner imposed an unlawful liquidated damages clause" in its contract: "Each count alleges, in some manner, that Time Warner received payments from the late fees 'which are not reasonably related to its actual costs.' " *Id.,* ¶ 36 n.12.

¶ 31. We described the nature and purpose of the voluntary payment doctrine as follows: "[M]oney paid voluntarily, with knowledge of all the facts, and without fraud or duress, cannot be recovered merely on account

[14] The *Putnam* opinion does not cite a specific statute. It is necessary to turn to the appendix that was filed in that case to determine that the damages were claimed under Wis. Stat. § 100.18(1).

661

of ignorance or mistake of the law." *Id.,* ¶ 13. The voluntary payment doctrine "allows entities that receive payment for services to rely upon these funds and to use them unfettered in future activities" and "operates as a means to settle disputes without litigation by requiring the party contesting the payment to notify the payee of its concerns." *Id.,* ¶ 16.

¶ 32. Ultimately, we determined that the voluntary payment doctrine barred the customers "from recovering monetary damages for their payment of allegedly unlawful fees without objection or protest." *Id.,* ¶ 3. We concluded that the customers had paid the fees without objection or protest, and that their payments were not made as a result of fraud, duress, or mistake of fact. *Id.,* ¶ 3.

¶ 33. We neither cited to nor individually addressed the customers' claim under Wis. Stat. § 100.18(1). Rather, we grouped together all of the remaining claims and collectively disposed of them in a footnote: "[B]ecause the customers are precluded under the voluntary payment doctrine from seeking repayment of allegedly unlawful liquidated damages, the additional claims [for money damages] are encapsulated in the overall [unlawful liquidated damages] theory and are properly subject to the voluntary payment doctrine." *Id.,* ¶ 36 n.12.

■
¶ 34. The *Putnam* court's application of the voluntary payment doctrine lends superficial support to the defendants' contention that the doctrine is a defense to all statutory claims and can likewise be applied to the statutes implicated in this case. Nevertheless, "questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon,

662

are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall,* 266 U.S. 507, 511 (1925).[15]

¶ 35. The *Putnam* court did not interpret Wis. Stat. § 100.18(1), and it did not rule upon whether the legislature intended the common law doctrine to be a viable defense to that statutory claim. Further, a review of the briefs filed in this court in *Putnam* reveals that the customers never advanced that the statutory claim should be treated any differently than the common law unlawful liquidated damages claim. They did not argue the issue we consider today.

¶ 36. In fact, the customers did not make any such argument in any court. During the hearing before the circuit court on Time Warner's motion to dismiss, the customers' attorney did not discuss or even mention Wis. Stat. § 100.18(1). Similarly, the circuit court did not mention the statutory claim when the court dismissed "all counts in this complaint."

---

[15] *See also Colby v. Columbia Cnty.,* 192 Wis. 2d 397, 405, 531 N.W.2d 404 (Ct. App. 1995) *aff'd,* 202 Wis. 2d 342, 550 N.W.2d 124 (1996) ("[W]e did not consider, and were not asked to consider [in a previous case], the impact of section 893.13(2), Stats. Our statement, although superficially supporting the City's position here, is thus not precedent."); *Fulton Found. v. Wisconsin Dep't Taxation,* 13 Wis. 2d 1, 10, 108 N.W.2d 312 (1961) ("Because the right of the department to raise the issue of constitutionality was not therein challenged, such case has no efficacy as a precedent with respect to such question."); *State ex rel. City of Sheboygan v. Cnty. Bd. of Supervisors,* 194 Wis. 456, 459, 216 N.W. 144 (1928) ("The relators cannot rely upon the fact that similar actions have been maintained in which the right of the municipality to prosecute such actions was not questioned, because the question now under consideration was neither raised nor considered in those cases. Such decisions are not authority either way upon this question.").

¶ 37. Likewise, the customers did not make any such argument in the court of appeals. The opinion of the court of appeals listed the claims made, including one for "violation of Wisconsin's trade practice statutes." *Putnam v. Time Warner Cable of Se. Wisconsin,* 2001 WI App 196, ¶ 3 n.1, 247 Wis. 2d 41, 633 N.W.2d 254. However, it noted that the customers made no separate argument regarding any statutory claim: "The customers present separate arguments challenging the circuit court's dismissal of both the claim for unlawful liquidated damages and the claim for declaratory and injunctive relief. However, they present a unified argument challenging the dismissal of all their other claims." *Id.*

¶ 38. The customers' opening brief to this court did not cite to Wis. Stat. § 100.18(1) or any other trade practices statutes. The only statute cited was the Uniform Declaratory Judgment Act, Wis. Stat. § 806.04. In their reply brief, the customers did not cite any statutes at all.

¶ 39. Rather, the customers' briefs focus on only one claim for damages—the common law unlawful liquidated damages claim. Under these circumstances, where no distinction between the common law and statutory claims was brought to any court's attention, it is unsurprising that this court grouped the claims for damages together and collectively affirmed their dismissal.

¶ 40. In *Putnam,* the question of whether the voluntary payment doctrine was a viable defense to a claim under Wis. Stat. § 100.18(1) may have lurked in the record, but it was neither brought to the attention of the court nor did the court specifically rule upon it. Accordingly, it has not been previously decided.[16]

---

[16] No Wisconsin court has taken up and decided whether the legislature intended the voluntary payment doctrine to be a

¶ 41. Having determined that no Wisconsin case squarely addresses the question before us, we turn to the relevant statutes. In its petition for review, MBS argued that the circuit court erroneously dismissed its

---

viable defense against any cause of action created by a statute. Although the court of appeals in this case cited to *Butcher v. Ameritech Corp.*, 2007 WI App 5, 298 Wis. 2d 468, 727 N.W.2d 546 (Ct. App. 2006), the court misconstrued that case.

In *Butcher*, it was alleged that Ameritech had collected taxes for services that were not properly subject to taxation. *Id.*, ¶ 1. Wisconsin's tax code provides a statutory procedure for recovering payments. In certain circumstances, taxpayers can file a claim for a refund with the Department of Revenue (DOR) under Wis. Stat. § 77.59(4)(a). The remedial scheme in Wis. Stat. § 77.59(4)(a) does not require taxpayers to protest the payment of unlawful taxes prior to seeking a remedy from the DOR.

The *Butcher* plaintiffs did not seek the remedy from the DOR as provided in Wis. Stat. § 77.59(4)(a). Rather, they filed suit in the circuit court directly against Ameritech.

The plaintiffs argued that application of the voluntary payment doctrine to bar their claims would violate the public policy as expressed in Wis. Stat. § 77.59. The *Butcher* court disagreed, holding that the voluntary payment doctrine was a viable defense against the claims filed against Ameritech in circuit court, even if the doctrine would not apply to claims made under Wis. Stat. § 77.59(4)(a). The court of appeals explained: "Section 77.59(4)(a) expresses the legislature's intent that a taxpayer need not protest the tax when paying it in order to recover a refund [from the DOR] under the procedure established in § 77.59(4)(a). *The statute expresses no intent and no policy judgment on whether the common law voluntary payment doctrine should apply in a court action outside the statutory scheme.*" *Id.*, ¶ 31 (emphasis added).

Because there was no Wis. Stat. § 77.59(4)(a) claim at issue in *Butcher*, the *Butcher* court had no occasion to evaluate the applicability of the voluntary payment doctrine to a cause of action created by statute.

claims for monetary relief under three statutes: Wis. Stat. § 100.207, Wis. Stat. § 100.18(1), and the Crime Control Act. However, the primary focus of the parties' arguments is on just one of these statutes, Wis. Stat. § 100.207. Accordingly, we likewise focus our discussion on that statute.

A

¶ 42. When interpreting a statute, this court strives to give effect to the language chosen by the legislature. In so doing, we consider the statute's scope, context, and purpose. *State ex. rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 48, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]cope, context, and purpose are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope, context, and purpose are ascertainable from the text and structure of the statute itself[.]"). "We begin by looking to the language of the statute because we assume that the legislature's intent is expressed in the statutory language." *Bosco v. Labor & Indus. Review Comm'n*, 2004 WI 77, ¶ 23, 272 Wis. 2d 586, 681 N.W.2d 157.

¶ 43. As always, a court should avoid adopting an interpretation that is contrary to a "textually or contextually manifest statutory purpose." *Kalal*, 271 Wis. 2d 633, ¶ 49. "[W]e will liberally construe remedial statutes to suppress the mischief and advance the remedy that the legislature intended to afford." *Garcia v. Mazda Motor of America, Inc.*, 2004 WI 93, ¶ 8, 273 Wis. 2d 612, 682 N.W.2d 365.

¶ 44. Wisconsin Stat. § 100.207 is entitled "telecommunications services." It prohibits false, mislead-

ing, or deceptive statements "with respect to the provision of telecommunications service," and it prohibits "bill[ing] a customer for any telecommunications service that the customer did not affirmatively order." Wis. Stat. §§ 100.207(2); 100.207(3)(a).

¶ 45. Subsection (2) provides:

> A person may not make in any manner any statement or representation with regard to the provision of telecommunications service, including the rates, terms or conditions for telecommunications service, which is false, misleading or deceptive, or which omits to state material information with respect to the provision of telecommunications service that is necessary to make the statements not false, misleading or deceptive.

Wis. Stat. § 100.207(2).

¶ 46. Subsection (3)(a) provides:

> A person may not engage in negative option billing or negative enrollment of telecommunications services, including unbundled telecommunications services. *A person may not bill a customer for any telecommunications service that the customer did not affirmatively order* unless that service is required to be provided by law, the federal communications commission or the public service commission. A customer's failure to refuse a person's proposal to provide a telecommunications service is not an affirmative request for that telecommunications service.

Wis. Stat. § 100.207(3)(a) (emphasis added).

¶ 47. Finally, subsection (6) sets forth two distinct remedies for violations of Wis. Stat. § 100.207.[17] First, a person (or class of persons) who is adversely affected by

---

[17] In relevant part, Wis. Stat. § 100.207(6) provides:

(a) 1. If a person fails to comply with this section, any person or class of persons adversely affected by the failure to comply has a

the violation may file a lawsuit for appropriate relief including damages. Wis. Stat. § 100.207(6)(a). Second, the Department of Justice (DOJ) or a district attorney may commence a lawsuit in the name of the State to enjoin violations. In such an action, the court may also order the defendant to "restore to any person any pecuniary loss." Wis. Stat. § 100.207(6)(b).

¶ 48. The State of Wisconsin, which filed an amicus brief in this case, explained that cramming is one of a number of deceptive billing practices to emerge in the 1990s. *See* United States General Accounting Office, *Overview of the Cramming Problem: Statement of Stanley J. Czerwinski* (1999). The State asserts that by enacting Wis. Stat. § 100.207 in 1994, the Wisconsin legislature specifically acted with the intent to provide the means to seek relief in the courts for deceptive and unauthorized billing.

claim for appropriate relief, including damages, injunctive or declaratory relief, specific performance and recission.

2. A person or class of persons entitled to relief under subd. 1. is also entitled to recover costs and disbursements.

(b) 1. The department of justice . . . or any district attorney, may commence an action in circuit court in the name of the state to restrain by temporary or permanent injunction any violation of this section. Injunctive relief may include an order directing telecommunications providers . . . to discontinue telecommunications service provided to a person violating this section or ch. 196 [which regulates public utilities]. Before entry of final judgment, the court may make such orders or judgments as may be necessary to restore to any person any pecuniary loss suffered because of the acts or practices involved in the action if proof of these acts or practices is submitted to the satisfaction of the court.

. . .

(c) Any person who violates subs. (2) to (4) shall be required to forfeit not less than $25 nor more than $5,000 for each offense. Forfeitures under this paragraph shall be enforced by the department of justice . . . .

¶ 49. The telecommunications company defendants imply that the real purpose and import of the statute is found in sub. (6)(b) and sub. (6)(c), the portions of the statute that permit the State to file actions and seek forfeitures against crammers. They indicate that the legislative intent was to give the State a "very heavy hammer," and that the private right of action in sub. (6)(a) is largely inconsequential because it is duplicative of preexisting common law claims.

¶ 50. The defendants' assertion of legislative purpose fails to square with the statute's plain language. Wisconsin Stat. § 100.207 is a remedial statute that provides two remedial paths, not one. In addition to the enforcement mechanisms provided to the State in subs. (6)(b) and (6)(c), "any person or class of persons adversely affected by the failure to comply" with the statute may bring an independent cause of action.[18]

¶ 51. In another context involving remedial statutes with a dual enforcement mechanism, we have explained that "private tenants actions provide a necessary backup to the state's enforcement powers." *Shands v. Castrovinci*, 115 Wis. 2d 352, 358–59, 340 N.W.2d 506 (1983). Because "the sheer number of violations prevent [the State] from proceeding against all violators," private actions "constitute an enforcement mechanism reinforcing that of the justice department." *Id.; see also Benkoski v. Flood*, 2001 WI App 84, ¶ 17, 242 Wis. 2d 652, 626 N.W.2d 851 ("[P]rivate actions augment enforcement of the [law] by the department of justice, which has insufficient resources to prosecute all violations.").

---

[18] By contrast, see Indiana's anti-cramming statutes and regulations, which do not provide a private right of action. *Lady Di's, Inc. v. Enhanced Services Billing, Inc.*, 654 F.3d 728 (7th Cir. 2011) (citing Ind. Code § 8–1–29–5(2) and 170 Ind. Admin. Code § 7–1.1–19(p)).

¶ 52. Courts interpret statutes to avoid surplusage. *Kalal,* 271 Wis. 2d 633, ¶ 46. If the legislature had intended nothing more in sub. (6)(a) than to duplicate preexisting common law claims, there would have been no need to enact sub. (6)(a) at all.

¶ 53. We must construe this statute "with a view towards the social problem which the legislature was addressing when enacting the law." *Garcia,* 273 Wis. 2d 612, ¶ 8. Based on the plain language of the statute, the manifest purposes of Wis. Stat. § 100.207 are to provide remedies for those who are adversely affected by cramming, and to deter that practice.[19]

¶ 54. If the voluntary payment doctrine were a viable defense to a person's cause of action under sub. (6)(a), however, both of these legislative purposes would be severely undermined. The application of the voluntary payment doctrine would significantly limit the circumstances under which a person would be entitled to a remedy under Wis. Stat. § 100.207. A person could maintain a claim under only two circumstances: if the person noticed the charges and protested before paying;

---

[19] Wisconsin Stat. § 100.207 was adopted by 1993 Wis. Act 496, which made numerous changes related to the regulation of telecommunications utilities. There is scant legislative history that focuses specifically upon the purpose of Wis. Stat. § 100.207. Information Memorandum 94–27, published by the Wisconsin Legislative Council, merely provides: "The Act creates new consumer protections, including . . . [p]rohibiting deceptive advertising of telecommunications services and limiting telecommunications services sales and bill collection practices[.]" The absence of legislative history does not impede our ability to interpret the statute, given that the legislative purposes of Wis. Stat. § 100.207 are manifest in the text of the statute.

or if the person could satisfy one of the common law exceptions to the voluntary payment doctrine.[20] Frequently, the person would be required to overcome the high hurdle of proving all of the elements of common law fraud.[21]

¶ 55. The plain text of Wis. Stat. § 100.207 sets forth a broad remedy available to persons who are adversely affected by cramming. Under the statute, a plaintiff need not protest an unauthorized charge to seek a remedy. Nevertheless, if the voluntary payment doctrine were a viable defense, then plaintiffs would either have to protest or satisfy all of the elements of fraud, duress, or mistake of fact. The broad statutory remedy set forth by the legislature would be severely circumscribed.

¶ 56. Application of the voluntary payment doctrine would likewise undermine the legislature's purpose to deter cramming by limiting the circumstances

---

[20] At oral argument, counsel for ILD appeared to agree that the application of the common law doctrine would limit the remedy to these two circumstances. He stated: "There is not an element in the statute that says that a protest is required. But if the common law defense of the voluntary payment doctrine applies and you have this rare customer . . . his payment was not the result of fraud, duress, or mistake of fact, then to get around the voluntary payment doctrine, that customer would have to protest."

[21] For example, in this case, the circuit court concluded that the voluntary payment doctrine was a viable defense to the claims for damages and then explained: "For the plaintiffs to claim that the voluntary payment doctrine does not apply on account of fraud, they must satisfy the court of three elements: First that there was a knowingly false representation of fact; Second, that it was made with intent to defraud and for the purpose of inducing another to act upon it; and Third, the recipient must have relied on the representation and must have been induced to rely on it which act caused the claimed damage."

under which a customer would be entitled to relief. The defendant telecommunications companies explain that whenever a customer notices an unauthorized charge and complains, the unauthorized charges are cancelled. As a result of the customer's protest, no claim for damages would arise. If the voluntary payment doctrine were a viable defense, one could conceive of very few situations in which a private action would produce an actionable claim for damages.

¶ 57. The statute is meant to deter the practice of cramming by holding crammers responsible for the illegal practice in court. However, application of the common law defense would reduce the likelihood that crammers would face any consequence at all for violating the statute. Rather than being deterred by the statute's remedial scheme, telecommunications companies might be encouraged to produce more unauthorized charges, knowing that customers who do not initially notice deceptive charges will face high hurdles to recovering those payments in a court action. Applying the voluntary payment doctrine to bar many private rights of action could encourage cramming, the mischief the legislature sought to suppress, by eliminating "a necessary backup to the state's enforcement powers." *See Shands,* 115 Wis. 2d at 358–59.

¶ 58. A court's interpretation of a statute should not "contravene a textually or contextually manifest statutory purpose." *Kalal,* 271 Wis. 2d 633, ¶ 49. Remedial statutes should be liberally construed to "suppress the mischief and advance the remedy that the legislature intended to afford." *Garcia,* 273 Wis. 2d 612, ¶ 8. Here, application of the common law voluntary payment doctrine would encourage the mischief identified by the legislature and circumscribe the remedy it provided. That is, application of the common law de-

fense would undermine both textually manifest purposes of Wis. Stat. § 100.207.

B

¶ 59. Despite the damage that application of the voluntary payment doctrine would do the manifest purposes of Wis. Stat. § 100.207, the defendants assert that such a result is compelled by *Fuchsgruber*, 244 Wis. 2d 758. They contend that under the rule of *Fuchsgruber*, the common law voluntary payment doctrine applies to all new causes of action created by the legislature unless the legislature uses express language to the contrary. If the legislature intended to make the voluntary payment doctrine inapplicable to claims under Wis. Stat. § 100.207, the defendants assert that it was required to make explicit reference to the doctrine in the text of that statute. They contend that the absence of such a reference forecloses MBS's argument that the common law defense is inapplicable because it is inconsistent with the purposes of the statute.

¶ 60. At this point, we pause to make an observation regarding the scope and consequences of the defendants' argument. The defendants' interpretation of *Fuchsgruber* would appear to apply equally to all common law doctrines and rules. Thus, if the defendants correctly interpret *Fuchsgruber*, the legislature would be required to identify and evaluate each and every potentially relevant common law doctrine and rule, whether well known or obscure, and enumerate every one that is inapplicable whenever it creates a new statutory cause of action.[22]

---

[22] For instance, it appears that under the defendants' interpretation of *Fuchsgruber*, the legislature would be required to

673

¶ 61. Overlaying all new statutory causes of action with the myriad of common law doctrines and rules would accomplish a sweeping change in the law of the state. This sweeping change is not mandated by *Fuchsgruber.*

¶ 62. In *Fuchsgruber,* after being injured by a product, the plaintiff filed a strict product liability claim against the product's distributor. 244 Wis. 2d 758, ¶¶ 4–5. In a strict product liability claim, the defendant's liability is based not upon fault, but rather, upon the defective condition of the product. *Id.,* ¶ 22.

¶ 63. Around the same time that the plaintiff was injured, the legislature amended the comparative negligence statute. Under the amended statute, a plaintiff's negligence would be compared against the negligence of each individual defendant for purposes of determining liability in an action for negligence. *Id.,* ¶ 13. The amended statute also modified the rules for joint and several liability, so that only those defendants found to be at least 51 percent negligent could be jointly and severally liable for a plaintiff's damages. *Id.*

¶ 64. Relying on the new statutory language that expressly modified the rules for negligence actions, the distributor argued that the legislature intended to modify the rules for strict product liability actions as well. It argued that the statute, as applied to strict product liability claims, "operates to protect from liability a defendant who is merely an innocent member of the chain of distribution, who did nothing to cause or contribute to the defective condition of the product." *Id.,* ¶ 11.

---

routinely add language listing common law doctrines such as laches, estoppel, unclean hands, voluntary payment, privity, economic loss, etc.

¶ 65. This court disagreed. We explained that "strict product liability is not negligence," that negligence and strict product liability were separate torts with distinct common law rules, and that "[t]he comparative negligence statute has never fully applied to strict product liability actions in the first place[.]" *Id.*, ¶ 27. We examined the text of the amended comparative negligence statute and concluded that it did not "explicitly or even implicitly suggest a legislative purpose to change the common law of strict product liability." *Id.*, ¶ 26.

¶ 66. As illustrated by this explanation, the focus of our analysis was discerning the legislature's intent. We explained further: "While the 1995 amendment clearly ushered in a significant development in negligence law, there is nothing in the language of the new statute that even hints at a legislative purpose to accomplish such a sweeping change in the common law of strict product liability in this state." *Id.*, ¶ 29. Accordingly, we concluded that the amendment to the comparative negligence statute, "which is silent on the subject, does not abrogate or alter the common law of strict product liability." *Id.*, ¶ 27.

¶ 67. It is in this context that we made the following statements, upon which the defendants rely:

> It is axiomatic that a statute does not abrogate a rule of common law unless the abrogation is clearly expressed and leaves no doubt of the legislature's intent. Statutes in derogation of the common law are strictly construed. A statute does not change the common law unless the legislative purpose to do so is clearly expressed in the language of the statute. To accomplish a change in the common law, the language of the statute must be clear, unambiguous, and peremptory.

*Id.*, ¶ 25.

675

¶ 68. The defendants' argument takes this language out of context. *Fuchsgruber* does not stand for the proposition that every time the legislature creates a new cause of action, it must enumerate each and every potentially relevant common law doctrine or rule that is inapplicable to that cause of action. Such a proposition would place a weighty and unrealistic burden on the legislature when drafting new statutes.

¶ 69. In addition to burdening the legislature, the defendants' interpretation of *Fuchsgruber* would needlessly tie the court's hands. In *Fuchsgruber,* there was no inconsistency between the legislature's purpose to modify the rules applicable to negligence actions and the common law rules that pertain to strict liability claims. Here, by contrast, the voluntary payment doctrine is incompatible with the manifest purposes of Wis. Stat. § 100.207. In a case like this, the defendant's interpretation of *Fuchsgruber* would force the court to interpret a statute contrary to the clear legislative intent. Such a proposition would turn on its head the established canon of construction that a statute should not be interpreted to contravene its manifest purpose. *Kalal,* 271 Wis. 2d 633, ¶ 49.

¶ 70. The reasoning underlying *Fuchsgruber* remains sound. If the legislature wanted to abrogate the voluntary payment doctrine, certainly it would be required to do so using express language.[23] However, MBS makes no suggestion that by enacting Wis. Stat. § 100.207, the legislature intended to fully abrogate the

---

[23] *See State v. Hobson,* 218 Wis. 2d 350, 577 N.W.2d 825 (1998) (abrogating the common law right to forcibly resist an unlawful arrest). The *Hobson* court cited *Black's Law Dictionary* for that proposition that "abrogate" means "[t]o annul, cancel, revoke, repeal, or destroy." *Id.,* ¶ 1 n.1 (citing *Black's Law Dictionary* 8 (6th ed. 1990)).

common law doctrine. Rather, the argument is only that the legislature did not intend the doctrine to be a viable defense to an action under Wis. Stat. § 100.207.

¶ 71. Whenever the application of a common law doctrine or rule would undermine the manifest purposes of a statutory cause of action, the conflict between the statute's manifest purpose and the common law defense "leaves no doubt of the legislature's intent." *Fuchsgruber,* 244 Wis. 2d 758, ¶ 25. In a case of such apparent incompatibility, the legislature necessarily intended that the common law defense would not be applied to bar claims under the statute.

¶ 72. We find support in a case that postdates both *Fuchsgruber* and the circuit court's grant of the motion to dismiss in this case. In *Stuart v. Weisflog's Showroom Gallery,* 2008 WI 22, 308 Wis. 2d 103, 746 N.W.2d 762, we concluded that the legislature did not intend the common law economic loss doctrine to be a viable defense against the Home Improvement Protection Act (HIPA)[24] because it would defeat the purpose of the statutory cause of action. *Id.,* ¶ 35 ("[T]o apply the [economic loss doctrine] to the HIPA claims would defeat the public policies underpinning the HIPA and the remedies it provides."); *id.,* ¶ 33 ("We are satisfied that the [economic loss doctrine] cannot apply to statutory claims, including those under HIPA, because of such public policies.").

¶ 73. We also find support in case law from other jurisdictions. Other courts have concluded that the voluntary payment doctrine was not a viable defense to claims for damages caused by illegal cramming. For example, in *Huch v. Charter Communications, Inc.,* 290

---

[24] *See* Wis. Admin. Code § ATCP 110 (Oct. 2004) and Wis. Stat. § 100.20(5).

S.W.3d 721 (Mo. 2009), a state administrative regulation prohibited the practice of billing for unsolicited merchandise. In a statutory action for violation of the regulation, the Missouri supreme court concluded that the voluntary payment doctrine was inapplicable as a defense because the doctrine "would nullify the protections of the act and be contrary to the intent of the legislature." *Id.* at 727. *See also Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.,* 170 P.3d 10 (Wash. 2007) (concluding that the voluntary payment doctrine was not a defense in a cramming case where the court construed the statute liberally in favor of plaintiffs); *Sobel v. Hertz Corp.,* 698 F. Supp. 2d 1218 (D. Nev. 2010) (concluding that the voluntary payment doctrine did not bar a claim for damages arising out of the practice of cramming because it would undermine the legislature's intent).[25]

¶ 74. Given the conflict between the manifest purposes of Wis. Stat. § 100.207 and the voluntary payment doctrine, we conclude that the doctrine is inapplicable to a claim under that statute.[26] Accordingly, the circuit court erred when it dismissed MBS's claims for money damages under Wis. Stat. § 100.207.

¶ 75. As ILD notes, however, its cross-appeal asserted various alternative reasons to affirm the circuit

[25] For a contrary position, see *Lady Di's, Inc. v. Enhanced Services Billing, Inc.,* slip copy, No. 1:09–CV–340–SEB-DML (S.D. Ind., Nov. 16, 2010), *aff'd* on other grounds by *Lady Di's, Inc. v. Enhanced Services Billing, Inc.,* 654 F.3d 728 (7th Cir. 2011).

[26] Wisconsin Const. art. XIV § 13 provides: "Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state until altered or suspended by the legislature." The parties do not argue that this constitutional provision is implicated in this case.

court's dismissal of MBS's Wis. Stat. § 100.207 claims. *See supra,* ¶ 23 n.13. The court of appeals declined to address these alternative arguments because it concluded that the voluntary payment doctrine was dispositive. Given our decision that the voluntarily payment doctrine is inapplicable, we remand to the court of appeals to address these alternative arguments.

C

¶ 76. As explained above, we have focused our analysis on Wis. Stat. § 100.207 because the parties primarily focused on that statute. Before concluding, however, we pause to briefly address MBS's claims under Wis. Stat. § 100.18(1) and the Crime Control Act.

¶ 77. We emphasize that the voluntary payment doctrine remains alive and well in Wisconsin. The determination of whether the doctrine bars a cause of action is a statute-specific inquiry.

¶ 78. At this point, we do not decide whether the voluntary payment doctrine is a viable defense to a claim under Wis. Stat. § 100.18(1). The circuit court provided an alternative rationale for dismissing MBS's § 100.18(1) claims. *See supra,* ¶ 21. Although MBS appealed the alternative rationale in its brief to the court of appeals, it did not include this argument in its petition for review in this court. Under these circumstances, we need not now interpret Wis. Stat. § 100.18(1). Rather, we remand to the court of appeals to address the alternative rationale that the claim presented herein does not come within Wis. Stat. § 100.18(1) and, if appropriate, whether the voluntary payment doctrine applies to claims made under that statute. *See State v. Achterberg,* 201 Wis. 2d 291, 300 n.5, 548 N.W.2d 515 (1996).

¶ 79. We likewise do not decide whether the voluntary payment doctrine is a viable defense to a cause of action under the Crime Control Act. As shown above, the applicability of the common law doctrine to a statutory cause of action is a statute-specific analysis. Neither the circuit court nor the court of appeals specifically addressed the provisions of the Crime Control Act. Although MBS asserts that "the legislative purpose behind [the Crime Control Act] would be undermined if the voluntary payment doctrine could be used as a defense," it fails to examine or even set forth the text of that statute. Given the scant briefing regarding this statute, we decline to interpret it here. *See Grube v. Daun,* 213 Wis. 2d 533, 544, 570 N.W.2d 851 (1997).

¶ 80. However, nothing set forth in this opinion should be construed to restrict the court of appeals from taking up these arguments on remand, if it determines that they were sufficiently preserved. If the court of appeals concludes that MBS stated a claim under Wis. Stat. § 100.18(1), then it will need to address whether the voluntary payment doctrine is a viable defense to a claim under that statute. Further, the court of appeals may be required to determine whether the common law doctrine is a viable defense to a claim under the Crime Control Act.

V

¶ 81. In sum, we conclude that no Wisconsin court has addressed whether the legislature intended the voluntary payment doctrine to be a viable defense against any cause of action created by a statute. In *Putnam,* the question of whether the voluntary payment doctrine was a viable defense to a claim under Wis. Stat. § 100.18(1) may have lurked in the record,

but it was neither brought to the attention of the court nor was it specifically addressed. Accordingly, it was not decided by this court.

¶ 82. We further determine that the defendants misinterpret *Fuchsgruber.* Application of the common law voluntary payment doctrine would undermine the manifest purposes of Wis. Stat. § 100.207. Under these circumstances, the conflict between the statute's purpose and the common law defense leaves no doubt that the legislature intended that the common law defense should not be applied to bar claims under the statute.

¶ 83. Accordingly, we reverse and remand to the court of appeals to address ILD's cross-appeal and, if appropriate, any previously unresolved appellate issues regarding Wis. Stat. § 100.18(1) and the Wisconsin Organized Crime Control Act.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the court of appeals.

¶ 84. SHIRLEY S. ABRAHAMSON, C.J., did not participate.

¶ 85. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). The voluntary payment of money by one person to another upon a demand of payment, with knowledge of the facts and without fraud or duress, generally bars the payor from recovering the money from the payee in subsequent litigation. This is the essence of the voluntary payment doctrine. *See Putnam v. Time Warner Cable of Se. Wis.*, 2002 WI 108, ¶¶ 13–15, 255 Wis. 2d 447, 649 N.W.2d 626.

¶ 86. The voluntary payment doctrine is described in 66 Am. Jur. 2d *Restitution and Implied Contracts* § 92 (2011) as follows:

681

Unjust enrichment contemplates an involuntary or nonconsensual transfer, unjustly enriching one party. A defendant is not unjustly enriched and therefore not required to make restitution where the benefit was conferred by a volunteer. Thus, a person cannot use the courts to recover money voluntarily or consensually paid with full knowledge of all of the facts and without fraud, duress, or extortion in some form. This doctrine is often referred to as the "voluntary payment doctrine" or the "volunteer rule" and is considered an exception to the principle of restitution. Thus, it is universally recognized that money voluntarily paid [by a person] under a claim of right to payment and with knowledge of the facts by the person [seeking to recover] cannot be recovered on the ground that the claim was illegal, or that there was no liability to pay in the first instance.

(Footnotes omitted.)

¶ 87. The voluntary payment doctrine,[1] which is heavily fact-dependent, has deep roots in Wisconsin law. The doctrine is discussed repeatedly in cases involving payments, especially tax payments, to governments.[2] *G. Heileman Brewing Co. v. City of La Crosse,* 105 Wis. 2d

[1] The term "voluntary payment doctrine" appears to be of relatively recent origin. Past cases referred to the "voluntary payment rule," *G. Heileman Brewing Co. v. City of La Crosse,* 105 Wis. 2d 152, 162, 312 N.W.2d 875 (Ct. App. 1981), "the doctrine of voluntary payment," *Frederick v. Douglas Cnty.,* 96 Wis. 411, 423, 71 N.W. 798 (1897) (Winslow, J. concurring), or just "voluntary payment," *Elliott v. Swartwout,* 35 U.S. 137, 153 (1836). Regardless of the name, the concept permeates the law.

[2] For a background of the voluntary payment doctrine in the Wisconsin state income tax context, *see generally* Maurice M. Weinstein, *Income Tax Refunds in Wisconsin,* 16 Marq. L. Rev. 25, 30–32 (1931). The article discusses the voluntary payment doctrine in substantially its modern form. *Id.* at 30.

While the voluntary payment doctrine is often discussed in the context of payments *to* governments, the same rules do not

152, 312 N.W.2d 875 (Ct. App. 1981); *Interstate Dep't Stores v. Henry,* 224 Wis. 394, 272 N.W. 451 (1937); *Schlesinger v. State,* 198 Wis. 381, 223 N.W. 856 (1929); *Rutledge v. Price Cnty.,* 66 Wis. 35, 27 N.W. 819 (1886); *see Simmons Co. v. Tax Comm'n,* 209 Wis. 232, 244 N.W. 610 (1932); *Fox Valley Canning Co. v. Vill. of Hortonville,* 207 Wis. 502, 242 N.W. 142 (1932); *Roehl v. City of Milwaukee,* 141 Wis. 341, 124 N.W. 400 (1910); *Parcher v. Marathon Cnty.,* 52 Wis. 388, 9 N.W. 23 (1881); *Harrison v. City of Milwaukee,* 49 Wis. 247, 5 N.W. 326 (1880). However, the court also has applied the doctrine outside the tax context. *E.g., Putnam,* 255 Wis. 2d 447 (liquidated damages in a cable television contract); *Burgess v. Commercial Nat'l Bank of Appleton,* 144 Wis. 59, 128 N.W. 436 (1910) (excess interest paid on bonds); *Raipe v. Gorrell,* 105 Wis. 636, 81 N.W. 1009 (1900) (payment of wages during an employee's absence); *Custin v. City of Viroqua,* 67 Wis. 314, 30 N.W. 515 (1886) (excess payment for liquor license).

¶ 88. The voluntary payment doctrine is neither unique to Wisconsin nor something new. To illustrate, in 1836 the United States Supreme Court discussed the application of the doctrine to an overcharge of a duty by a collector at the Port of New York. The Court deter-

necessarily apply in the context of payments *from* government agents. *See* Joshua E. Dodge, *How To Sue the Government,* 8 Marq. L. Rev. 267, 285 (1924) ("When . . . a public officer . . . pays out to an individual money which the law did not authorize . . . the Government may recover [it] back, unhampered by any of the rules of voluntary payment . . . applicable as between individuals."); *but see Frederick,* 96 Wis. at 423 (Winslow, J. concurring) (suggesting that the opinion of the court applied the doctrine of voluntary payment to payments made by public officials). Joshua Dodge was a member of this court from 1898–1910. *Portraits of Justice* 28 (Trina E. Gray et al. eds., 2d ed. 2003).

mined that when a voluntary payment has been made, "no action will lie to recover back the money." *Elliott v. Swartwout,* 35 U.S. 137, 153 (1836). The Court acknowledged, however, that if a payor gives notice to the payee that the demand for payment may be illegal—that is, if the payor protests the payment—then the voluntary payment doctrine does not bar recovery by the payor. *Id.*

¶ 89. In reaching this decision, the Court relied on several English cases—dating back two centuries. One case, *Brisbane v. Dacres,* (1813) 128 Eng. Rep. 641 (C.P.) 645; 5 Taunt. 143, 152–53 (opinion of Gibbs, J.), describes the doctrine as follows:

> We must take this payment to have been made under a demand of right, and I think that where a man demands money of another as a matter of right, and that other, with a full knowledge of the facts upon which the demand is founded, has paid a sum, he never can recover back the sum he has so voluntarily paid. It may be, that upon a further view he may form a different opinion of the law, and it may be, his subsequent opinion may be the correct one. If we were to hold otherwise, I think many inconveniences may arise; there are many doubtful questions of law: when they arise, the Defendant has an option, either to litigate the question, or to submit to the demand, and pay the money. I think, that by submitting to the demand, he that pays the money gives it to the person to whom he pays it, and makes it his, and closes the transaction between them. He who receives it has a right to consider it as his without dispute: he spends it in confidence that it is his; and it would be most mischievous and unjust, if he who has acquiesced in the right by such voluntary payment, should be at liberty, at any time within the statute of limitations, to rip up the matter, and recover back the money. He who received it

is not in the same condition: he has spent it in the confidence it was his, and perhaps has no means of repayment.

¶ 90. Thus, in 1813, an English court eloquently described the rationale underlying the doctrine of voluntary payment: to promote finality in commercial transactions and to protect payees who in good faith spend the money they receive.

¶ 91. Any suggestion that the voluntary payment doctrine is so old that it is now a dead letter is belied by a decision of the United States Court of Appeals for the Seventh Circuit in 2010. *Spivey v. Adaptive Marketing LLC,* 622 F.3d 816 (7th Cir. 2010). In that decision the court, in an opinion written by Retired Justice Sandra Day O'Connor, sitting by designation, explained that "[t]he voluntary payment doctrine has long been recognized in common law" and cited Illinois cases as recent as 2005, to determine that the voluntary payment doctrine barred the plaintiff's claims. *Id.* at 822–24.

¶ 92. Having established both the lineage and vitality of the voluntary payment doctrine, I freely concede that this common law doctrine may be abrogated by legislation. As far back as 1929, Corpus Juris explained that:

Payment

1X. Recovery of Payments

A. Voluntary Payments—1. Recoverability in General

§ 280

Except where otherwise provided by statute it is a well settled general rule that a person cannot, either by way of set-off or counterclaim, or by direct action, recover back money which he has voluntarily paid with

685

a full knowledge of all the facts, and without any fraud, duress, or extortion, although no obligation to make such payment existed.

48 C.J. § 280 (1929) (footnotes omitted).
Notably, the only statute cited to support the exception was from Louisiana, a code state not operating under common law.

¶ 93. Nonetheless, the common law may be abrogated. This fundamental principle is reflected in Article XIV, Section 13 of the Wisconsin Constitution which reads: "Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state *until altered or suspended by the legislature.*" Wis. Const. art. XIV, § 13 (emphasis added).

¶ 94. The question inevitably arises when we interpret this section: How do we know when the legislature has "altered or suspended" some feature of the common law? This question was addressed in *Kranzush v. Badger State Mutual Casualty Co.,* 103 Wis. 2d 56, 74, 307 N.W.2d 256 (1981). The court said:

"It is an accepted axiom of law in Wisconsin that:

" 'Statutes are not to be construed as changing the common law unless the purpose to effect such change is clearly expressed therein. To have such effect "the language [of the statute] must be clear, unambiguous and peremptory." ' *Wis. Bridge & Iron Co. v. Indus. Comm'n,* 233 Wis. 467, 474, 290 N.W. 199 (1940)."

*Maxey v. Redevelopment Auth. of Racine,* 94 Wis. 2d 375, 399, 288 N.W.2d 794 (1980). The legislative intent to change the common law must be expressed "beyond any reasonable doubt." *Grube v. Moths,* 56 Wis. 2d 424,

437, 202 N.W.2d 261 (1972); *Burke v. Milwaukee & Suburban Transp. Corp.,* 39 Wis. 2d 682, 690, 159 N.W.2d 700 (1968).

*Id.; see also Meek v. Pierce,* 19 Wis. 318 (*300), 322 (*303) (1865) ("[T]he rules of the common law are not to be changed by doubtful implication. To give such effect to the statute, the language must be clear, unambiguous and peremptory."); *NBZ, Inc. v. Pilarski,* 185 Wis. 2d 827, 836, 520 N.W.2d 93 (Ct. App. 1994) ("A statute in derogation of the common law must be strictly construed so as to have minimal effect on the common law rule.").

¶ 95. Ten years ago this court applied these principles in the context of a comparative negligence statute and strict product liability. *Fuchsgruber v. Custom Accessories, Inc.,* 2001 WI 81, 244 Wis. 2d 758, 628 N.W.2d 833. The court determined that an amendment to that statute did not apply to strict product liability claims. *Id.,* ¶ 30. In reaching this conclusion, the court stated:

> It is axiomatic that a statute does not abrogate a rule of common law unless the abrogation is clearly expressed and leaves no doubt of the legislature's intent. Statutes in derogation of the common law are strictly construed. A statute does not change the common law unless the legislative purpose to do so is clearly expressed in the language of the statute. To accomplish a change in the common law, the language of the statute must be clear, unambiguous, and peremptory.

*Id.,* ¶ 25 (citations omitted).

¶ 96. I am satisfied that Wis. Stat. § 100.207(3)(a) is so clearly designed to protect telecommunications consumers from particular unfair practices in billing that it would be unreasonable to permit the voluntary

687

payment doctrine to nullify the effect of the statute. Subsection (3)(a) reads as follows:

> (3) SALES PRACTICES. (a) A person may not engage in negative option billing or negative enrollment of telecommunications services, including unbundled telecommunications services. A person may not bill a customer for any telecommunications service that the customer did not affirmatively order unless that service is required to be provided by law . . . . A customer's failure to refuse a person's proposal to provide a telecommunications service is not an affirmative request for that telecommunications service.

Wis. Stat. § 100.207(3)(a). The evils prohibited by subsection (3)(a) are not ambiguous, and the private remedies created to attack these evils are plainly identified in subsection (6)(a) of the section. Among the evils prohibited is cramming, an attempt to get customers to "unwittingly pay the unauthorized charges" that appear on their telecommunications bills. Majority op., ¶ 6. Even if these payments are not obtained by fraud, their voluntariness is certainly questionable. Cramming charges are prohibited under subsection (3)(a) and the legislature provided a specific remedy in subsection (6)(a) of a right to recover these payments when the payments have been made. In sum, subsection (3)(a) targets demands for unauthorized charges and subsection (6)(a) provides for recovery of those charges when paid. Quasi-voluntary payment of the charges does not bar recovery.

¶ 97. The application of Wis. Stat. § 100.207(2) to the alleged facts is not so clear because subsection (2), which is labeled "ADVERTISING AND SALES REPRESENTATIONS," is different from subsection (3), which is labeled "SALES PRACTICES." Applying the *sales* language of subsection (2) to the *billing* practices of

"cramming" and "slamming"[3] is probably stretching the subsection beyond what it was intended to cover.

¶ 98. The bottom line, however, is that the voluntary payment doctrine does not require the dismissal at this time of the claims in this case under this anti-cramming/anti-slamming statute. We need not answer whether the voluntary payment doctrine could *ever* apply to a claim under Wis. Stat. § 100.207.

¶ 99. Wisconsin Stat. § 100.18 requires a different analysis. This sweeping statute can be traced back to Chapter 510, Laws of 1913, which created section 1747k of the statutes. Section 1747k read:

> Any person, firm, corporation or association who, with intent to sell or in any wise dispose of merchandise, securities, service, or anything offered by such person, firm, corporation or association, directly or indirectly, to the public for sale or distribution, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or an interest therein, for the purpose of defrauding the public, makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, or letter, or in any other way, an advertisement of any sort regarding merchandise, securities, service, or anything so offered to the public, which advertisement contains any assertion, representation or statement of fact which is

[3] " 'Slamming' is the illegal practice of *switching* a consumer's traditional *wireline* telephone company for local, local toll, or long distance service without permission." FCC Encyclopedia, http://www.fcc.gov/encyclopedia/slamming (last visited Feb. 17, 2012).

untrue, deceptive or misleading, shall be guilty of a misdemeanor, and shall upon conviction thereof be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than ten days nor more than ninety days, or by both such fine and imprisonment; providing that nothing herein shall apply to any proprietor or publisher of any newspaper or magazine who publishes, disseminates or circulates any such advertisement without knowledge of the unlawful or untruthful nature of such advertisement.

§ 1747k, ch. 510, Laws of 1913. This one-paragraph provision has been amended at least 45 times over the past century and has evolved into a lengthy (nearly 2600 words), very complex statute that is difficult to cabin and difficult to analyze.

¶ 100. To suggest in the majority opinion that the legislature abrogated the voluntary payment doctrine when it adopted Wis. Stat. § 100.18 is both unnecessary and unfounded.

¶ 101. Because the majority opinion cannot support such a proposition either analytically or historically, it simply concludes that:

> Whenever the application of a common law doctrine or rule would undermine the manifest purposes of a statutory cause of action, the conflict between the statute's manifest purpose and the common law defense "leave[s] no doubt of the legislature's intent." *Fuchsgruber,* 244 Wis. 2d 758, ¶ 25. In a case of such apparent incompatibility, the legislature necessarily intended that the common law defense would not be applied to bar claims under the statute.

Majority op., ¶ 71. With this conclusion, the majority opinion apparently abandons this court's longstanding methodology in evaluating when the legislature has

690

abrogated the common law. The methodology that the majority applies—that is, to search for some conflict with a statutory purpose—weakens all common law doctrines. This methodology leaves the viability of all common law defenses in doubt.

¶ 102.　The majority opinion casts a cloud of uncertainty over commercial transactions in this state. Its assurance that "the voluntary payment doctrine remains alive and well in Wisconsin," majority op., ¶ 77, will prove hollow if its discussion of the doctrine in relation to Wis. Stat. § 100.18 is maintained.

¶ 103.　The majority opinion invites consideration of the proposition that Wis. Stat. § 100.18 abrogated the voluntary payment doctrine by asserting that the relationship between the voluntary payment doctrine and § 100.18 was never "brought to the attention of the [*Putnam*] court [in 2002] nor did the court specifically rule upon it. Accordingly, it [w]as not . . . decided" by the court in *Putnam.* Majority op., ¶ 40. I disagree.

¶ 104.　*Putnam* discussed the first amended complaint that was dismissed with prejudice by the circuit court. *Putnam,* 255 Wis. 2d 447, ¶¶ 1, 4 n.2. The opinion cites the multiple theories in the amended complaint, including unlawful liquidated damages, unjust enrichment, restitution, and violation of Wisconsin's Trade Practices Act. *Id.,* ¶ 4 n.2. All are affected by the voluntary payment doctrine. The Wisconsin Trade Practices Act is identified as Wis. Stat. § 100.18 in Count VII of the amended complaint cited in Putnam's brief. It was discussed by the circuit court, and it was referred to in the published court of appeals decision, *Putnam v. Time Warner Cable of Se. Wis.,* 2001 WI App 196, ¶ 3 n.1, 247 Wis. 2d 41, 633 N.W.2d 254, which affirmed the circuit court. The *Putnam*

majority, in turn, affirmed the circuit court and the
court of appeals in relation to the voluntary payment
doctrine.

¶ 105. In doing so, the *Putnam* court said: "In
analyzing this case, we . . . take as true *all allegations
made in the customers' amended complaint* and draw all
reasonable inferences in favor of the customers."
*Putnam*, 255 Wis. 2d 447, ¶ 11 (emphasis added). The
court also cited 66 Am. Jur. 2d *Restitution and Implied
Contracts* § 108 (2001), a precursor to § 92 of the 2011
edition cited above. Unjust enrichment and restitution
are part of the 2001 Am Jur analysis. *Putnam*, 255
Wis. 2d 447, ¶ 13.

¶ 106. In the present case the majority opinion
takes the fact that the *Putnam* court "collectively dis-
posed of" the stated claims, majority op., ¶ 33, as
support for the proposition that there ought to be a
*difference* between statutory and common law claims.
Curiously, the majority opinion takes our past *identical*
treatment of statutory and common law claims as
support for the proposition that the claims ought to be
treated *differently*. Likewise, the opinion's analysis ig-
nores that we determined that the voluntary payment
doctrine applied to all claims in *Putnam*—statutory and
common law alike. *Putnam*, 255 Wis. 2d 447, ¶ 36 n.12.

¶ 107. The *Putnam* court addressed the possibil-
ity that the legislature could act to supersede the
voluntary payment doctrine in a paragraph strongly
affirming the doctrine:

> Adoption of the customers' argument would effec-
> tively destroy the voluntary payment doctrine. The
> doctrine presupposes mistaken or wrongful conduct by
> the payee. To allow someone who made voluntary
> payment without objection to claim restitution, based

only on an allegation that some wrongful conduct by the payee caused the payment of a fee, would nullify the doctrine in Wisconsin. We conclude that the merit of a claim and the underlying wrongdoing of the defendant do not undercut the applicability of the doctrine, absent fraud, duress, or mistake of fact. *The legislature has the power to create additional exceptions to the voluntary payment doctrine in particular circumstances.*

*Putnam,* 255 Wis. 2d 447, ¶ 35 (emphasis added).

¶ 108. It is unlikely that the court would have acknowledged the legislature's power "to create additional exceptions to the voluntary payment doctrine" if the court thought that the legislature had already done so in adopting Wis. Stat. § 100.18.

¶ 109. I believe this case may go forward under Wis. Stat. § 100.207(3)(a) because the statute prohibits specific billing practices in telecommunications and actually addresses a person's "failure to refuse" an unauthorized charge. This alters the voluntary payment doctrine so that claims under the statute are not required to be dismissed in this case at this stage in the proceedings. The legislature provided a clear remedy for overpayment of certain charges. The legislature was clear, unambiguous, and peremptory in this paragraph; the court need not go further and alter the law of abrogation of the common law.

¶ 110. I concur with the court's decision that the dismissal of the claim under Wis. Stat. § 100.207 must be reversed. However, I disagree with the court's statement of the law and its decision regarding the other claims. Therefore, I cannot join the court's opinion.

¶ 111. For the foregoing reasons, I respectfully concur in part and dissent in part.

¶ 112. I am authorized to state that Justice MICHAEL J. GABLEMAN joins this concurrence/dissent.