Asma Masri, Petitioner-Appellant,†

v.

State of Wisconsin Labor and Industry Review,
Respondent-Respondent,

Medical College of Wisconsin,
Interested Person-Respondent.

Court of Appeals

*No. 2012AP1047. Submitted on briefs December 5, 2012.
—Decided April 2, 2013.*

2013 WI App 62

(Also reported in 832 N.W.2d 139.)

† Petition to review filed.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Lawrence G. Albrecht*, Milwaukee.

On behalf of the respondent-respondents, the cause was submitted on the briefs of *Steven C. Kilpatrick*, assistant attorney general, and *J.B. Van Hollen* attorney general and *Amy Schmidt Jones* and *Kirk A. Pelikan* of *Michael Best & Friedrich LLP*, Milwaukee.

Before Fine, Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Asma Masri appeals from a circuit court order affirming the Labor and Industry Review Commission's ("LIRC") determination that she was not an employee protected by Wisconsin's health care worker protection statute, WIS. STAT. § 146.997 (2011–12),[1] and that, therefore, she was not entitled to a full review of her complaint by the Equal Rights Division ("ERD") of the Wisconsin Department of Workforce Development. For the reasons that follow, we affirm.

## BACKGROUND

¶ 2. In August 2008, Masri, a doctoral candidate at the University of Wisconsin-Milwaukee, began an unpaid internship with the Medical College of Wisconsin ("MCW"). Masri's official title was "Psychologist Intern," and she was assigned to the transplant surgery unit at Froedtert Hospital. Masri worked forty hours a week and was provided with office space, support staff, free parking, full access to facilities and patient records, and professional networking opportunities. Masri's supervisor promised to provide her with health insurance coverage and the ability to pursue grants, but Masri received neither before her termination.

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version.

6

¶ 3. In November 2008, Masri met with an MCW official to report alleged medical ethics violations she asserts that she observed during her internship. Masri's internship with MCW was terminated soon thereafter.

¶ 4. Following her termination, Masri filed a retaliation complaint with the ERD, alleging that her termination violated WIS. STAT. § 146.997. An ERD officer issued a Preliminary Determination and Order, dismissing Masri's complaint on the grounds that the ERD did not have jurisdiction under § 146.997 because Masri was not an employee protected under the statute. An ALJ affirmed the Preliminary Determination and Order in January 2010.

¶ 5. Masri then filed a timely petition for review with LIRC. After considering the parties' positions and the evidence submitted by the ALJ, LIRC affirmed the ALJ's decision in August 2011.

¶ 6. In September 2011, Masri filed a petition for judicial review in Milwaukee County Circuit Court, seeking a reversal of LIRC's decision and a remand to ERD for a full investigation of her complaint. The circuit court affirmed LIRC's decision.

¶ 7. Masri now appeals from the circuit court's order and again seeks a reversal and remand to ERD for a full investigation.

## DISCUSSION

¶ 8. Masri argues that WIS. STAT. § 146.997— entitled "Health care worker protection"—protects her from retaliation from MCW for reporting her medical ethics concerns. (Bolding omitted.) She argues that the statute's use of the word "person" indicates that the legislature intended the statute to protect both employees and non-employees from retaliation, and that even

7

if the statute only covers employees, she was an employee at MCW at the time she reported her ethical concerns. We disagree, concluding that: (1) LIRC's decision should be afforded at least due weight deference; (2) LIRC's conclusion that § 146.997 only applies to employees is consistent with the clear meaning of the statute and is reasonable; and (3) LIRC's decision that Masri is not an employee is also consistent with the clear meaning of the statute and is reasonable. As such, we affirm.

## I. Standard of Review.

¶ 9. We review LIRC's decision rather than that of the circuit court. *Oshkosh Corp. v. LIRC*, 2011 WI App 42, ¶ 6, 332 Wis. 2d 261, 796 N.W.2d 217. "We defer to LIRC's factual findings unless they are not supported by credible and substantial evidence." *Id.* Though questions of law are normally answered by the courts rather than administrative agencies, we "may accord deference to an agency's ruling on a question of law, such as statutory interpretation." *Aldrich v. LIRC*, 2012 WI 53, ¶ 92, 341 Wis. 2d 36, 814 N.W.2d 433.

¶ 10. In reviewing LIRC's statutory interpretations, Wisconsin courts traditionally apply one of three discrete levels of deference to LIRC's decisions: great weight, due weight, or no weight (*de novo* review). *Racine Harley-Davidson, Inc. v. State of Wis. Div. of Hearings and Appeals*, 2006 WI 86, ¶ 12, 292 Wis. 2d 549, 717 N.W.2d 184.

¶ 11. The greatest level of deference—great weight—requires that we defer to LIRC's interpretation

unless its interpretation is irrational, even when we find another interpretation to be equally reasonable or more reasonable. *Milwaukee Symphony Orchestra, Inc. v. Wisconsin DOR*, 2010 WI 33, ¶ 35, 324 Wis. 2d 68, 781 N.W.2d 674. The Wisconsin Supreme Court has outlined the circumstances under which great weight deference is appropriate:

> 'Great weight' deference is warranted when (1) the agency is charged by the legislature with administering the statute in question; (2) the agency interpretation is of long standing; (3) the agency employed its specialized knowledge or expertise in interpreting the statute; and (4) the agency's interpretation will provide uniformity and consistency in the application of the statute.

*Volvo Trucks N. Am. v. State of Wis. DOT*, 2010 WI 15, ¶ 14, 323 Wis. 2d 294, 779 N.W.2d 423.

■■

¶ 12. The middle level of deference—due weight —requires reviewing courts to sustain LIRC's interpretation as long as "it is not contrary to the clear meaning of the statute and no more reasonable interpretation exists." *Milwaukee Symphony Orchestra*, 324 Wis. 2d 68, ¶ 36. Due weight deference is warranted "when the agency is charged by the legislature with enforcement of the statute and has experience in the area, but has not developed expertise that necessarily places the agency in a better position than the court to interpret the statute." *Id.* An agency reaches this level of experience after it has had "at least one opportunity to analyze the issue and formulate a position." *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 286, 548 N.W.2d 57 (1996). On appeal, a reviewing court may replace the agency's interpretation with a more reasonable one if one exists. *Milwaukee Symphony Orchestra*, 324 Wis. 2d 68, ¶ 36.

¶ 13. The lowest level of deference—no weight—allows reviewing courts to interpret the statute independently of LIRC and adopt the interpretation that they deem most reasonable. *Id.*, ¶ 37. "Reviewing courts give no deference to an agency's statutory interpretation when any of the following conditions are met: (1) the issue presents a matter of first impression; (2) the agency has no experience or expertise relevant to the legal issue presented; or (3) the agency's position on the issue has been so inconsistent as to provide no real guidance." *Id.*

¶ 14. Masri argues that we should award LIRC's decision here no deference because the issue raised is one of first impression. We disagree and conclude that, at the very least, due weight deference is appropriate.

¶ 15. LIRC addressed whether Wis. Stat. § 146.997 pertains solely to employees on at least one other occasion in *Ratsch v. Memorial Medical Center*, ERD Case No. CR200504192 (Mar. 10, 2006). Furthermore, LIRC has extensive experience and expertise in deciding who is an employee under similar statutory schemes. *See, e.g., Ficken v. Harmon Solutions Grp.*, ERD Case No. CR200003282 at *3 (Feb. 7, 2003); *Langer v. City of Mequon*, ERD Case No. 199904168 at *1–2 (Mar. 19, 2001); *Hall v. School Dist. St. Croix Falls*, WC Claim No. 2005–003827 (June 25, 2007).

¶ 16. In sum, we conclude that both prongs of the due weight deference test are satisfied here: (1) the parties do not dispute that the legislature has charged LIRC with administering the statute; and (2) we conclude that LIRC has addressed the issues on at least one other occasion. Having decided that LIRC's decision should be accorded due weight deference, and noting

10

that we must uphold its decision unless that decision is contrary to the clear meaning of the statute and no more reasonable interpretation exists, we turn to the issues raised by Masri. *See Milwaukee Symphony Orchestra*, 324 Wis. 2d 68, ¶ 36.

## II. LIRC's decision that WIS. STAT. § 146.997 only applies to employees is consistent with the statute's clear language and is reasonable.

¶ 17. Masri argues that WIS. STAT. § 146.997 protects all "individual[s] who suffered retaliatory treatment for reporting health care misconduct," rather than only protecting employees, as LIRC and the circuit court concluded. In support of her claim, Masri points to the legislature's use of the word "person" rather than "employee" in § 146.997(3). However, Masri's definition of "person," as explained in more detail below, requires us to ignore the language in the rest of § 146.997 directed solely at employees. Because Masri's interpretation of the statute is contrary to the statute's plain language and is therefore not more reasonable than LIRC's, we affirm.

¶ 18. Masri's argument presents an issue of statutory interpretation. The purpose of statutory interpretation is to discern the intent of the legislature. *State v. Byers*, 2003 WI 86, ¶ 13, 263 Wis. 2d 113, 665 N.W.2d 729. When we interpret a statute, " '[w]e begin with the statute's plain language because we assume that the legislature's intent is expressed in the words it used.' " *Orion Flight Servs., Inc. v. Basler Flight Serv.*, 2006 WI 51, ¶ 16, 290 Wis. 2d 421, 714 N.W.2d 130 (citation omitted). "If we conclude the statutory language is

11

plain, then we apply its plain meaning." *JP Morgan Chase Bank, NA v. Green*, 2008 WI App 78, ¶ 24, 311 Wis. 2d 715, 753 N.W.2d 536. We must also interpret statutory language "in the context in which it is used" by considering words "not in isolation but as part of a whole." *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110. In addition, we read statutory language reasonably "to avoid absurd or unreasonable results." *Id.* " 'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.' " *Id.* (citation omitted).

¶ 19. Masri's complaint arises from her disagreement with LIRC over the scope of WIS. STAT. § 146.997(3). The disputed text reads as follows:

> No health care facility or health care provider and no employee of a health care facility or health care provider may take disciplinary action against, or threaten to take disciplinary action against, *any person* because the *person* reported in good faith any information under sub. (2)(a), in good faith initiated, participated in or testified in any action or proceeding under sub. (2)(c) or provided in good faith any information under sub. (2)(d) or because the health care facility, health care provider or employee believes that the *person* reported in good faith any information under sub. (2)(a), in good faith initiated, participated in or testified in any action or proceeding under sub. (2)(c) or provided in good faith any information under sub. (2)(d).

*See* § 146.997(3)(a) (emphasis added).

¶ 20. In order to determine the legislature's intent, we must look at the text of WIS. STAT. § 146.997 as a whole. Subsection (1) sets forth numerous definitions used in the statute, but does not define person. Subsec-

12

tion (2) sets forth the types of reports that are protected, recognizing the right to report certain legal, ethical, and clinical standard violations committed by a health care facility, health care provider, or an employee of either. Subsection (3) prohibits "disciplinary action" against those who make the types of reports protected under subsection (2). Subsections (4) and (5) set forth an enforcement mechanism and penalty for violating the prohibition against disciplinary action for making reports under subsection (2). Finally, subsection (6) lays out the statute's notification requirements.

¶ 21. While Masri correctly points out that the legislature uses the word "person" several times in Wis. Stat. § 146.997(3), she ignores the fact that the other subsections of the statute, which interplay with subsection (3), are limited to employees.

¶ 22. For instance, Wis. Stat. § 146.997(3) only prohibits disciplinary action taken against persons who make a protected report in good faith under §§ 146.997(2)(a), (2)(c), or (2)(d). But subsections (2)(a), (2)(c), and (2)(d) only permit *employees* to file reports, stating:

> (a) Any *employee* of a health care facility or of a health care provider who is aware of any information . . . may report that information to any agency . . . of the state . . . .
>
> . . . .
>
> (c) Any *employee* of a health care facility or health care provider may initiate, participate in or testify in any action or proceeding in which a violation specified in par. (a)1. or 2. is alleged.
>
> (d) Any *employee* of a health care facility or health care provider may provide any information relating to an

13

alleged violation specified in par. (a)1. or 2. to any legislator or legislative committee.

*See* §§ 146.997(2)(a), (c), (d) (emphasis added). Because subsections (2)(a), (2)(c), and (2)(d) only permit employees to file reports, and subsection (3), by its plain terms, can only protect persons who have made a (2)(a), (2)(c), or (2)(d) report, it would be absurd to broadly interpret protected persons to include non-employees. *See Kalal,* 271 Wis. 2d 633, ¶ 46 (we read statutory language "to avoid absurd or unreasonable results").

¶ 23. Furthermore, WIS. STAT. § 146.997(1)(b) defines the " '[d]isciplinary action' " prohibited by § 146.997(3) as:

any action taken *with respect to an employee* which has the effect, in whole or in part, of a penalty, including but not limited to any of the following:

(a) Dismissal, demotion, transfer, removal of any duty assigned to the employee's position, refusal to restore, suspension, reprimand, verbal or physical harassment or reduction in base pay.

(b) Denial of education or training, if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation or other personnel action.

(c) Reassignment.

(d) Failure to increase base pay, except with respect to the determination of a discretionary performance award.

*See* § 146.997(1)(b) (defining " '[d]isciplinary action' " as defined in WIS. STAT. § 230.80(2)). In other words, while subsection (3) prohibits "disciplinary action against, or threaten[ed] . . . disciplinary action against, any person," because "[d]isciplinary action," by the statute's own defi-

14

nition, is limited to "action taken with respect to an employee," it would be contrary to common sense and reason to conclude that subsection (3)'s reference to "any person" included non-employees. *See* §§ 146.997(1), (3), and 230.80(2).

¶ 24. WISCONSIN STAT. § 146.997(4)(a), the statute's enforcement provision, also requires us to conclude that § 146.997(3)'s reference to "person" is limited to employees. Section 146.997(4)(a) provides that "[a]ny *employee* of a health care facility or health care provider who is subjected to disciplinary action . . . may file a complaint with the department." (Emphasis added.) In short, the statute does not permit non-employees to file a complaint for retaliation for filing a protected report.

¶ 25. Given the text of the entire statute, it is clear that the legislature only intended to protect employees from retaliatory behavior for filing a protected report. It defies common sense to interpret WIS. STAT. § 146.997(3) as broadly protecting *all* individuals who make a protected report from disciplinary action, when the statute only permits employees to file a protected report or a complaint, and defines disciplinary action in terms of employment. As such, we affirm LIRC's decision that the statute only protects employees because its conclusion is consistent with the statute's plain language and Masri has not shown that her interpretation of the statute is more reasonable than LIRC's.

**III. LIRC's conclusion that Masri was not an employee is consistent with WIS. STAT. § 146.997's plain language and is reasonable.**

██ ██

¶ 26. Masri further argues, contrary to the conclusions of LIRC and the circuit court, that even if WIS. STAT. § 146.997 only applies to employees, she qualifies

AS AN EMPLOYEE UNDER THE STATUTE. HOWEVER, MASRI FAILS TO CONVINCE US THAT LIRC'S INTERPRETATION OF THE STATUTE TO THE CONTRARY IS INCONSISTENT WITH THE STATUTE'S LANGUAGE OR THAT HER DEFINITION OF THE WORD "EMPLOYEE" IS MORE REASONABLE THAN LIRC'S. THEREFORE, WE AFFIRM.

¶ 27. WISCONSIN STAT. § 146.997 does not explicitly define the term employee, and neither LIRC nor a court has ruled upon the statute's definition of the term. However, in other statutory schemes where the term employee has been left undefined or ambiguous by the legislature, courts have determined that some sort of compensation is essential to an employee/employer relationship. *See e.g., C.R. Meyer and Sons Co. v. Grady*, 194 Wis. 615, 623, 217 N.W. 408 (1928) ("One of the usual and ordinary tests, and, in many instances, the decisive test, which stamps one engaged in performing work an employee rather than an independent contractor, is the fact that wages are paid.") (worker's compensation); *Klusendorf Chevrolet-Buick, Inc. v. LIRC*, 110 Wis. 2d 328, 335, 328 N.W.2d 890 (Ct. App. 1982) (holding that while "wages are a necessary part of an employer-employe[e] relationship, the wages need not be money") (workers compensation).

¶ 28. Relying on that case law, LIRC has consistently looked to how an individual is compensated for his or her work when determining whether an individual is an employee, requiring that there be some tangible benefit received apart from salary. *See, e.g., Ficken*, ERD Case No. CR200003282 at *3 (holding that "compensation is an essential condition in the employee/employer relationship, and a person who is not eligible for compensation does not qualify for Title VII" and Wisconsin Fair Employment Act ("WFEA") coverage); *Langer*, ERD Case No. 199904168 at *1–2

16

(holding that the parties were not in an employment relationship under the WFEA where "the complainant was not on the respondents' payroll and received no tangible benefit in exchange for her services for the respondents"); *Hall*, WC Claim No. 2005–003827 (holding that an unpaid high school basketball coach was not an employee under the workers compensation statute). When the legislature uses a term that has obtained a settled meaning, we must infer, unless the text of the statute says otherwise, that the legislature intended for that settled meaning to apply. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992).

¶ 29. Relying on those cases here, LIRC concluded that Masri was not an employee, stating:

> [T]he complainant makes an argument that, under *Langer*, she could be considered an employee based solely upon "tangible benefits," even if she received no salary. [LIRC] does not find this argument persuasive. Accepting the possibility that there could be other "tangible benefits" of employment apart from salary, the complainant's assertions do not establish that she received such benefits. The complainant characterizes her "all access" security badge for the respondent's facilities, office space, support staff, and parking, as tangible benefits. However, parking, office space, and the like were provided to enable the complainant to perform her assigned duties and did not constitute a form of compensation. None of those items were for the complainant's personal benefit, nor did they have any value to her independent of her services for the respondent. The complainant also contends that she received tangible benefits in terms of networking and development opportunities that would benefit her future professional career. However, while networking may indeed be a benefit of her internship, it is not a tangible one nor something to which a value can be assigned.
>
> In her brief the complainant also maintains that her supervisor promised her health insurance and applied

17

for grants to compensate her work financially. However, neither a promise of health insurance that has not been made good on, nor a willingness to pay a salary at some future time, contingent upon the receipt of grant funding, is sufficient to render the complainant an employee of the respondent's.

¶ 30. LIRC's decision is not contrary to the clear language in Wis. Stat. § 146.997, and is firmly rooted in case law and past LIRC decisions. LIRC accepted Masri's argument that she could be considered an employee even without receiving any salary provided she received a tangible benefit from her internship. But LIRC concluded Masri received no tangible benefit. As such, LIRC's conclusion is reasonable. Futhermore, we agree with LIRC's conclusion. Office support that simply enabled Masri to perform her duties cannot be considered an independent tangible benefit and the concept of "networking opportunities" is not tangible and is too vague to be compensation. The promise of health insurance, which was never delivered, cannot be viewed as a benefit, especially because Masri continued to perform her internship without it. And the promise to apply for research grant funding did not convey any tangible benefit to Masri because receipt of funding was totally out of MCW's control. Because Masri has not shown that her conclusion that she was an employee is more reasonable than LIRC's, we are compelled to affirm.[2]

*By the Court.*—Order affirmed.

[2] With respect to the Dissent's emphasis on the laudable public policy goals of the health-care whistleblowers statute, Wis. Stat. § 146.997, we note only that the issue in this case is a less global one. As the Dissent notes the whistleblower statute is triggered only if Masri was an employee. That determination is simply a matter of statutory construction, case law, and LIRC precedent. As we have shown, LIRC's interpretation of the law

18

¶ 31. FINE, J. (*dissenting*). George Orwell observed that "[i]n a time of universal deceit, telling the truth is a revolutionary act."[1] In a similar vein, William O. Douglas recognized in his Pentagon Papers concurring opinion that there is a natural tendency to want to keep secret things that people have a right to know: "'The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information." *New York Times Co. v. United States*, 403 U.S. 713, 723–724 (1971) (Douglas, J., concurring). Although this case does not, of course, concern the First Amendment (at least as framed for us), it affects a similar important policy—the suppression of information embarrassing to health-care facilities and providers.

¶ 32. The legislature has declared that no person employed by a "health care facility or health care provider" may be disciplined for reporting that:

- "the health care facility or health care provider has violated any state law or rule or federal law or regulation"; or

- "there exists any situation in which the quality of any health care service provided by the health care facility or health care provider or by any employee of the health care facility or health care provider violates any standard established by any state law or rule or federal law or regulation or any clinical or ethical standard established by a professionally recognized accrediting or standard-setting body and poses a potential risk to public health or safety."

WIS. STAT. § 146.997(2)(a)1., 2. & (3). The "dominant purpose" of § 146.997 is thus to prevent health-care

is reasonable. Masri received no tangible benefit from her internship and was not an employee under the statute.

[1] http://www.quotationspage.com/quote/35028.html (last visited March 18, 2013).

facilities and providers from using retaliation or the threat of retaliation in order to keep hidden their dirty linen.

¶ 33. Hiding health-care dirty linen is widespread. *See* Barry Meier, *Doctors Who Don't Speak Out*, N.Y. TIMES, Feb. 15, 2013, at SR5 (" 'The standard in the medical community is not to report[.]' ") (quoting, according to the article, "Dr. Robert Hauser, a cardiologist who, along with a colleague, warned other doctors in 2005 about a defective heart implant").[2] A recent Report by the Department of Health and Human Services Inspector General, Daniel R. Levinson, Esq., put the problem starkly:

> We requested that hospitals provide any internal incident reports involved with the hospitalization, including submissions to the hospital incidence-reporting systems, adverse drug reaction reports, complaints, peer reviews, and morbidity and mortality reviews, for the 278 sample Medicare beneficiary hospitalizations. However, hospitals did not provide, and apparently did not have, any reports for 112 of the 120 events (93 percent) found in the case study. Further, hospitals had no incident reports for two of the three events that resulted in death to the patients or two of the four events that resulted in serious disability.

Daniel R. Levinson, *Adverse Events In Hospitals: Methods For Identifying Events* 15 (Department of Health and Human Services, March, 2010) (parenthetical in original).[3]

---

[2] http://www.nytimes.com/2013/02/17/sunday-review/the-hip-replacement-case-shows- why-doctors-often-remain-silent.html (last visited March 18, 2013).

[3] https://oig.hhs.gov/oei/reports/oei-06-08-00221.pdf (last visited March 18, 2013).

¶ 34. The Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–11152, established the National Practitioner Data Bank to receive reports on matters affecting public-health services. *See* 42 U.S.C. §§ 11131–11134; 42 U.S.C. § 1396r-2; 45 C.F.R. Part 60. A 2009 study concluded that reports to the Data Bank were woefully inadequate. Alan Levine, Sidney Wolfe, M.D., *Hospitals Drop the Ball on Physician Oversight,* PUBLIC CITIZEN (May 27, 2009).[4] The study quoted an assessment by, among others, Ira Williams, who, as described in a review of his book *First Do No Harm: The Cure for Medical Malpractice,* was "a retired oral and maxillofacial surgeon and dental anesthesiologist with over 40 years of medical profession experience" who "served as chairman of the dental department and as a member of the dental staff executive committee at Methodist Hospital in Madison, Wisconsin," and who "also spent five years as a clinical instructor in the ear, nose, and throat, and plastic surgery departments at the University of Wisconsin Medical School and Hospital." Evelyn Yea Tyng Tang, *Review, First Do No Harm: The Cure for Medical Malpractice,* Vol. II, No. 1 SUFFOLK JOURNAL OF HEALTH & BIOMEDICAL LAW 143, 143 (2006).[5] As quoted by the Levine-Wolfe study, Dr. Williams explained the health-care wall of silence:

"Instead of shining a searchlight on the performance of their own members, hospital peer review committees prefer to stay in the shadows. They are willing to identify past problems and may recommend a slow, orderly change in standards of care, but they will not

[4] http://biotech.law.lsu.edu/cases/medstaff/1873.pdf (last visited March 18, 2013).

[5] http://www.law.suffolk.edu/highlights/stuorgs/health/upload /Tang-143–155.pdf (last visited March 18, 2013).

make substantial changes. *Most important, their first priority is to preserve the rights and privileges of doctors.* Their work is dictated by the desires of the medical staff and is rarely influenced by the needs of patients. Members of a peer review committee, it must be noted, are not evil or sinister people. Nor are they megalomaniacs. They are individuals who have been burned by circumstances and have learned to become robots who see no evil, hear no evil, speak no evil, in order to survive."

*Hospitals Drop the Ball on Physician Oversight* 22 (emphasis added). Indeed, the Levine-Wolfe study reports that from September 1, 1990 through December 31, 2007, 55.2% of registered Wisconsin hospitals *never* reported adverse health-care events to the National Practitioner Data Bank. Id., at 38. Nationwide, 48.9% of hospitals never reported. *Ibid.* And the problem is endemic. *See* James Dao, *A Pattern of Problems at Hospital for Veterans,* N.Y. TIMES, March 19, 2013, at A12 (Whistleblowers reveal significant problems at Department of Veterans Affairs medical center.)[6] *See also* Ingrid Christiaans-Dingelhoff, Marleen Smits, Laura Zwaan, Sanne Lubberding, Gerrit van der Wal, Cordula Wagner, *To what extent are adverse events found in patient records reported by patients and health-care professionals via complaints, claims and incident reports?* 11 BMC HEALTH SERVICES RESEARCH 49 (2011) ("In order to detect the same adverse events as identified by patient record review, one cannot rely on the existing reporting systems within hospitals.").[7] *Com-*

---

[6] http://www.nytimes.com/2013/03/19/us/whistle-blower-complaints-at-veterans-hospital-in-mississippi.html?hpw&_ r= 1&.

[7] http://www.biomedcentral.com/1472–6963/11/49 (last visited March 18, 2013).

*pare* Sue Evans, *Barriers to reporting: addressing concern from the trenches* (Centre of Research Excellence in Patient Safety, Monash University, Medicine, Nursing, and Health Sciences) (PowerPoint presentation with references).[8]

¶ 35. The consequences can be tragic when the public cannot see the dirty linen because potential whistleblowers are deterred by fears of possible retaliation. As representatives of thirty-three public interest organizations wrote to Congress in July of 2009 in support of tough whistleblower protection: "Protecting whistleblowers in the medical industry has more life and death consequences than in any other industry. It is not realistic to expect that doctors, nurses and other providers will defend medical consumers when needed, however, if they cannot defend themselves against retaliation."[9]

¶ 36. Critically, *the predominant purpose* of WIS. STAT. § 146.997 is thus *not* to advance the personal interests of health-care whistleblowers, but, rather, to *protect the people of* Wisconsin, who depend on health-care facilities and providers for their well-being and, indeed, their very lives. The public-policy command of § 146.997 is therefore akin to the well-established principle that even an at-will employee, who enjoys no tenure, may not be fired because he or she reveals a matter of overriding public concern. *See Brockmeyer v.*

---

[8] http://www.crepatientsafety.org.au/seminars/incidentmanagement/sueevans.pdf

last visited March 18, 2013).

[9] Letter from Tom Devine, Legal Director Government Accountability Project, et al to House Tri-Committee Regarding Whistleblower Protections (July 6, 2009), *available at* http://www.citizen.org/Page.aspx?pid=794 (last visited March 18, 2013).

*Dun & Bradstreet*, 113 Wis. 2d 561, 572–574, 335 N.W.2d 834, 840–841 (1983).

¶ 37. WISCONSIN STAT. § 146.997 commands that health-care whistleblowers shall not be gagged by the fear of retaliation. The agency, the circuit court, and the Majority ignore this command by holding that the protections the legislature crafted in § 146.997 apply *only* if the person working for the health-care provider or facility is paid money or other "tangible benefit" for that work. Majority, ¶¶ 28 & 30. I respectfully disagree that the legislature could have so intended.

¶ 38. First, although the Record here is silent as to how many interns work for health-care providers or facilities in either Wisconsin or the country without being paid money or some other "tangible benefit," unpaid internships are a recognized part of contemporary employment. Thus, the estimate in late 2011 was that: "More than 1 million Americans a year work as interns. About half of them are unpaid."[10] For example, even the United States Equal Employment Opportunity Commission advertised last year for unpaid interns: "Unpaid internships are available during the Fall and Spring semesters or during the Summer. The office asks that the Fall and Spring Interns commit to work at least 20 hours per week and Summer Interns commit to a full-time schedule for a total of 8–10 weeks during the Summer."[11]

---

[10] Beenish Ahmed, *Unpaid Interns: Real World Work or Just Free Labor?*, NPR (Nov. 16, 2011) http://www.npr.org/2011/11/16/142224360/unpaid-interns-real-world-work-or-just-free-labor (last visited March 18, 2013).

[11] http://www.eeoc.gov/eeoc/jobs/interns-oeo.cfm (Office of Equal Opportunity Legal Intern Program) (last visited March 18, 2013).

¶ 39. Second, requiring *paid* work (either in money or some other "tangible benefit") as a prerequisite to the employment protections afforded the public by Wis. Stat. § 146.997 ignores that payment is not a *sine qua non* condition of the "employment" relationship. Restatement (Third) of Agency, § 7.07 notes:

> (1) An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.
>
> (2) An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.
>
> (3) For purposes of this section,
>
> (a) an employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work, and
>
> (b) *the fact that work is performed gratuitously does not relieve a principal of liability.*

(Emphases added.) The latter point is emphasized by *comment f* to § 7.07: "The fact that an agent performs work *gratuitously* does not relieve a principal of vicarious liability when the principal controls or has the right to control the manner and means of the agent's performance of work." (Emphasis added.) Wisconsin law is similar. *See Heims v. Hanke*, 5 Wis. 2d 465, 468, 93 N.W.2d 455, 458 (1958) "("One volunteering service without any agreement for or expectation of reward may be a servant of the one accepting such services."),

*overruled on other grounds, Butzow v. Wausau Memorial Hospital*, 51 Wis. 2d 281, 290–291, 187 N.W.2d 349, 353–354 (1971).

¶ 40. No one disputes that the Medical College "control[ed] or ha[d] the right to control the manner and means" of the work Masri did for it. Further, no one disputes that although the Medical College did not pay Masri dollars or some other "tangible benefit," she nevertheless, received significant intangible benefits as a result of her work for it: education, experience, and opportunities for professional development. *Hyland v. Wonder*, 972 F.2d 1129, 1132 (9th Cir. 1992), recognized, in the First-Amendment retaliation area, that the nondollar benefits accruing to an unpaid volunteer may not be taken away because the unpaid volunteer blew the whistle on governmental malfeasance: "Retaliatory actions with less momentous consequences, such as loss of a volunteer position, are equally egregious in the eyes of the Constitution because a person is being punished for engaging in protected speech." *Id.* at 1135. The rule should not be different under WIS. STAT. § 146.997, which forbids retaliation against health-care whistleblowers.

¶ 41. Significantly, as already noted, WIS. STAT. § 146.997 is designed to *protect patients* (the scheme is thus *not,* as in the administrative decisions upon which the agency relied, solely to protect workers—*see* Majority, ¶ 28). Thus, it makes little difference that the Medical College did not pay Masri tangible compensation so that she may not have been the College's "employee . . . in the strict sense," *see Heims*, 5 Wis. 2d at 468, 93 N.W.2d at 458, because as someone working in the facility under the facility's directions and control, *and as someone privy to information encompassed by § 146.997's non-retaliation provisions,* the Medical Col-

26

lege was barred from retaliating against her for having done what § 146.997 encourages.

¶ 42. The Majority relies on the deference it says we owe the agency. We must, however, obey the manifest purpose of the legislative enactment: "As always, a court should avoid adopting an interpretation that is contrary to a 'textually or contextually manifest statutory purpose.' '[W]e will liberally construe remedial statutes to suppress the mischief and advance the remedy that the legislature intended to afford.' " *MBS-Certified Public Accountants, LLC v. Wisconsin Bell, Inc.*, 2012 WI 15, ¶ 43, 338 Wis. 2d 647, 666, 809 N.W.2d 857, 866 (quoted sources omitted). This rule also governs whether we must obey an agency's determination by giving it some degree of deference.

¶ 43. The Majority gives the agency's interpretation "due weight." But we do not accede to an agency's interpretation of a statute under the "due weight" standard if that interpretation defeats the legislative purpose, as it does here. *See M.M. Schranz Roofing, Inc. v. First Choice Temporary*, 2012 WI App 9, ¶ 7, 338 Wis. 2d 420, 427, 809 N.W.2d 880, 883 (Ct. App. 2011) ("In affording 'due weight' deference to the agency's interpretation, we will not overturn a reasonable agency decision that *comports with the purpose of the statute* unless we determine that there is a more reasonable interpretation available.") (emphasis added) (one set of quotation marks and quoted source omitted). Further, even under "great weight" deference, we also do not bow to the agency's view when that frustrates what the legislature wanted to accomplish. *See deBoer Transportation Inc. v. Swenson*, 2011 WI 64, ¶ 33, 335 Wis. 2d 599, 618, 804 N.W.2d 658, 667 ("Under great weight deference, the agency's interpretation and application of a statute must be reasonable. . . . An agency's

interpretation 'is unreasonable and may be reversed by a reviewing court . . . if it is clearly contrary to the legislative *intent,* history, or *purpose* of the statute.' ") (quoted sources omitted) (emphasis added). *See also Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

¶ 44. The legislature enacted WIS. STAT. § 146.997 to protect patients by immunizing health-care whistleblowers from retaliation. That those ensconced behind what the legislature recognized as the often all-too high wall of health-care silence may see whistleblowing as, to use Orwell's word, "revolutionary," or even treasonous, underscores why the statute is needed, whether the health-care workers who have knowledge of the things encompassed by § 146.997(a) receive tangible compensation or do not receive tangible compensation. Sadly, the agency's crabbed reading of the statute exiles health-care interns beyond the pale of the statute's protection even though they may have critical information to safeguard patients. This undercuts and thwarts § 146.997's manifest legislative purpose. Accordingly, I respectfully dissent from the Majority's decision to affirm.